Cutler v. Zollinger.

CUTLER, *Appellant,* v. ZOLLINGER.

Division One, June 19, 1893.

1. **Deed:** SANITY OF GRANTOR: AGE AND DISEASE.  While a grantor in a deed may avoid it by showing that he was *non compos mentis* at the time of its execution, yet the mere fact that his mind was impaired by age or disease did not render him incompetent to make the conveyance.

2. ———: ———. The legal test is the capacity to understand the nature and effect of the transaction.

3. ———: ———: MONOMANIA.  While a person may be insane on one subject and sane upon others, yet to invalidate an instrument because of monomania or partial insanity, it must appear that the defect related to the subject of the contract in question.

4. ———: ———: ———: BURDEN OF PROOF.  The burden is on the party asserting the hallucination to show its existence at the time of the making of the contract and that it related to the transaction in question.

5. **The Evidence in** this case reviewed, and the action of the trial court in refusing to set aside the deed in question because of the insanity of the maker, approved.

*Appeal from St. Louis City Circuit Court.*—HON. L. B. VALLIANT, Judge.

AFFIRMED.

*Edmond A. B. Garesche* for appellant.

(1) It is a fundamental principle that they who have no mind "cannot agree in mind" with another,

and as this is the essence of a contract, they cannot enter into a contract. Parsons on Contracts [7 Ed.], sec. 383. (2) If a person therefore enters into a contract while deprived of reason, and afterwards recovers his reason, he may repudiate that contract. *Hovey v. Hobson*, 53 Me. 451; Parsons on Contracts [7 Ed.], sec. 384; *Turner v. Rusk*, 53 Md. 65; 2 American and English Encyclopedia of Law, page 149; *Kerwin v. Ins. Co.*, 25 Fed. Rep. 692. (3) And it is no answer that the sane party, when contracting, was not apprised of the other's insanity and did not suspect it, and did not overreach such insane person, or practice any fraud or unfairness on him. *Seaver v. Phelps*, 11 Pick. 304; *Folsom's Adm'r. v. Garner*, 15 Mo. 496. (4) And while the deed of an insane person may be unaffirmed without returning the purchase money (*Halley v. Troester*, 72 Mo. 73; *Bringham v. Fayerweather*, 144 Mass. 48; *Chanyler v. Simmons*, 97 Mass. 408), yet we do not ask any such decree in this case. (5) The evidence in this case established, not only affirmatively, but conclusively, that the appellant was not in her right mind when she executed and delivered to respondent the conveyance in controversy. That on the contrary she was suffering with melancholia, with delusions, and that her act in conveying this property was directly connected with those delusions. (6) The evidence offered by appellant, both expert and non-expert testimony, overwhelmingly established the fact that she was suffering from monomania for a long time prior to the execution of the deed; manifested to those in attendance upon her frequent and irrefragable proof that she was suffering from delusions inseparably connected with this transaction prior to and on the very day of the conveyance, and also for a long time subsequently, when at last her condition became so serious as to necessitate her being placed in an asylum for the

insane for treatment.    (7)  While the burden of proof, when the issue is upon a contract, rests upon the party disputing sanity (*Farrell v. Bremen*, 32 Mo. 328; *State v. Smith*, 53 Mo. 267) yet the proof of a single act manifesting insanity is of far more convincing weight to establish mental disease than any number of interviews and observations in which no such manifestations of insanity occur.    For it is a fact of universal knowledge that the most confirmed lunatics in many cases impose upon intelligent people impressions of their perfect sanity, and this oftenest occurs with monomaniacs. *Bishop v. Hunt*, 24 Mo. App. 373.   Mad men may show more sense at times than ordinary individuals.   Ray's Medical Jurisprudence of Insanity, sec. 409.

*L. A. Steber* for respondent.

(1) If Mrs. Cutler was insane when she sold the property or made the deed, by what remarkable process did she become sane, when she sent Mrs. Rattigan to defendant, to get back the property?    (2)  Mrs. Cutler's reasons for selling, *first*, dampness of the house; *second*, rheumatism; *third*, if place could be sold, she wanted to go to the hospital for treatment; *fourth*, run out of money, and needed money to keep up her shares in the building association.    (3)  Plaintiff's allegation (see her petition) of conspiracy and fraud was not sustained. (4) If plaintiff ever became insane, she became so after the sale of the property.   Her sanity was not questioned before the sale.    (5)  Delusions alone are not a legal test of insanity.   *Ins. Co. v. Broughton*, 109 U. S. 121. (6) An insane person's contract made during a lucid interval is binding.   *McCormack v. Little*, 85 Ill. 62. (7) It has always been held that where one has contracted in good faith, without notice of lunacy, equity will not rescind the contract on that ground.   *Heard v.*

*Sack*, 81 Mo. 610; *Bank v. Moore*, 78 Pa. St. 407, 414; *Mathiessen v. McMahon*, 38 N. J. Law, 536; *Lincoln v. Buckmaster*, 32 Vt. 652; *Yauger v. Skinner*, 14 N. J. Eq. (1 McCarter) 389; *McCormack v. Little*, 85 Ill. 62; *Ins. Co. v. Hunt*, 79 N. Y. 541. (8) One dealing with an insane person, and not knowing his condition, or any facts to put him on his guard, will be protected by the courts of law and equity against such person repudiating his contract on the ground of his mental incapacity; but the rule is not a technical one to be relied on at all times and under all circumstances. It is applied in each case only to prevent a wrong being done, and is based on the principle that "the law will not permit the lunatic's infirmity to be made an instrument of fraud." The case at bar is a proper one for the application of this rule. Anson on Cont. [2 Am. Ed.], p. 152; *Wireback v. Bank*, 97 Pa. St. 549; *Gribben v. Maxwell*, 34 Kan. 8; *Elliot v. Ince*, 7 De G. M. & G. 475; *Burnham v. Kidwell*, 113 Ill. 425; 11 American and English Encyclopedia of law, p. 136, title "Insanity." (9) Even if it were the fact, that plaintiff was subject to certain insane delusions, this is not a sufficient reason why she should be held to have been incompetent to make the deed, if the trier of the fact was satisfied, that the delusions to which she was subject had not so far affected the general faculties of her mind as to render her incompetent to deal with the property she thereby conveyed. *Jenkins v. Morris*, L. R. 14 Ch. D. 674. (10) Even when a person is affected with a delusion upon one specific subject, but is rational in other respects, he may be considered insane upon that subject, but not upon other subjects, *Mannin v. Hall*, Smith & Batty, 183; *Wright v. Jackson*, 59 Wis. 569; *Hovey v. Chase*, 52 Me. 304. (11) Although the mind of a person may be to some extent impaired

by age or disease, still, if he be capable of transacting his ordinary business—if he understands the nature of the business in which he is engaged and the effect of what he is doing, and can exercise his will with reference thereto—his acts will be valid and binding. *English v. Porter*, 109 Ill. 285; *Harvey v. Sullens*, 56 Mo. 372. (12) If the proof only shows a clear case of insanity directly connected with some violent disease, the party alleging insanity must bring proof of continued insanity to that point of time which bears directly upon the contract impeached, and not content himself with proof of insanity at an earlier period. *Turner v. Rush*, 53 Md. 65. (13) A partial unsoundness of mind, not affecting the general faculties, and not operating on the mind of a testator in regard to testamentary disposition, is not sufficient to render a person incapable of disposing of property by will. *Benoist v. Murrin*, 58 Mo. 307. (14) A person may be a monomaniac on a particular subject, but if the deed has no connection with his morbid condition it will be sustained. *Ekin v. McCracken*, 32 Leg. Intel. (Pa.) 405; s. c., 11 Phila. 534. (15) The presumption that insanity continues does not apply to cases of occasional or intermittent insanity. *State v. Lowe*, 93 Mo. 547; *College v. Wilkinson*, 108 Ind. 314; *State v. Wilmer*, 40 Wis. 304; *Townshend v. Townshend* 7 Gill (Md.), 10; *State v. Reddick*, 7 Kan. 143; *People v. Francis*, 38 Cal. 183; *Hall v. Warren*, 9 Ves. 605; *White v. Wilson,* 13 Ves. 87; *Lewis v. Baird*, 3 McLean (U. S.) 56; *Staples v. Wellington*, 58 Me. 453. (16) Opinions of expert medical witnesses as to mental capacity, expressed in response to hypothetical questions, are entitled to but little weight as against proof of facts showing mental capacity. *Burley v. McGough*, 151 Ill. 11.

BLACK, P. J.—The plaintiff conveyed a lot in the city of St. Louis, to the defendant for the consideration of $2,625, and this is a suit to set aside that deed, on the ground that the plaintiff was of unsound mind when she executed it.    She tenders a return of the purchase price paid to her by the defendant.

The petition contains other averments of fraud and oppression, but they are not supported by any evidence.    On the contrary the proof is all to the effect that the defendant in purchasing the property acted in perfect good faith throughout the entire transaction.    For the plaintiff two witnesses testified as to the value of the property, one placing it at $4,500 and the other at $4,600.    From other evidence in the case it appears that two small buildings on the property were thirty years old, and in a dilapidated condition.    The evidence of a number of witnesses produced by the defendant is to the effect that the property was not worth over $2,500 or $2,700.    Without detailing all of the evidence it is sufficient to say it satisfies us that defendant paid a fair value for the property.

The record contains a vast amount of evidence bearing upon the issue of insanity, and we can do no more than give the substance of it.    The deed from the plaintiff to the defendant bears date the twenty-fourth of September, 1889, and was delivered on that day.    This suit was commenced on the fourteenth of March, 1890.

Dr. Langan called to see Mrs. Cutler, the plaintiff, one month and a few days before the date of the deed. She was then in bed.    He conversed with her in a professional capacity for fifteen or twenty minutes. He says she was weak physically and mentally, but he could not say she was insane, though he advised her to

VOL. 117—7

go to a hospital for treatment.   She said she would do so if she could sell her property,  being the property in which she resided and the same property now in question.   Dr. Sullivan saw her on the first and again on the third of September.   He says the symptoms were those of inflammatory rheumatism.   On the second visit he became convinced she suffered from something else besides rheumatic trouble, something of a nervous character sufficient to affect her mental condition.   He says he does not recollect that she was then suffering from any delusion.

She became a patient in the St. Vincent's institution for the insane some two or three weeks after the date of the deed.   Dr. Bremer, the resident physician of the asylum, examined her at that time.  Speaking of this examination he says: "She was profoundly melancholic; she imagined she had done a great wrong at some time; she was full of delusions as to her bodily state; she imagined there was something wrong about her body, and that somebody abused her every night; that someone was cutting her on the back and across the stomach."   He says she was suffering from melancholia with delusions, and that she was not in a condition mentally to  transact any business.   He was asked questions based upon the assumption that she had been twice before in the asylum, but we find no proof of the fact so assumed, and must therefore disregard the answers based upon the unproved facts.   He says if she suffered from delusions leading her to imagine devils were in her bed and around her she was of unsound mind.

Mrs Eagan, a sister of the plaintiff, testified: "Every time I would go there she would complain of spirits; she said they were around her bed.   I tried to make her believe they were imaginary, but she did not seem to comprehend.   She said she knew they were

there, she was sure they were there. In talking of other matters she would jump from one subject to another without any apparent reason for it. At times she did not know what she was saying. From what I saw and observed of her condition, I do not think that she was of sound mind. I saw her the day before this deed was executed, and her mind was then in the condition which I have described. I think I saw her the very next day, and her condition had not changed any for the better; on the contrary it was worse after she had sold the property. It made her feel worse and seemed to increase the number of spirits around her, so far as I could judge of her statements to me."

A number of the neighbors and friends of the plaintiff gave evidence to the same effect. To such persons she insisted that spirits were around her and crawling over her.

Miss Maggie Cutler, a daughter of the plaintiff, says her mother was in the condition just described on the day the deed was executed. She testified on her examination-in-chief and again in rebuttal that her mother did not speak of devils and spirits in the presence of strangers, but as soon as they left she would begin to talk about such things. A son of the plaintiff, twenty-five years of age, gave evidence to the effect that his mother was flighty and imagined that she had done all sorts of uncharitable acts to her neighbors, and that she was not in a condition to transact business when she executed the deed. On cross-examination he admitted that he was present when the deed was executed, that is to say, he was in the kitchen, that he knew what the men were there for and the price his mother was getting for the property. He says he did not interfere or inform any one that his mother was not competent to execute a deed. He says his mother

would have nothing to do with him, and for this reason he hesitated to interfere.

The evidence for the defendant shows that the plaintiff placed this property in the hands of Messrs. Hammett, Anderson & Wade, real estate agents, for sale at the price of $3,500. This was more than a year before it was sold to defendant. They were unable to sell it at that price. She then reduced the price to $3000, saying she was anxious to sell because the walls of the house were damp and she desired to keep up payments on some shares she held in a building association. The agents were unable to sell the property at the reduced price, though they sent several persons to examine it. A Mr. Truesdale represented the defendant. He and the defendant examined the property and talked with the plaintiff about it. She told them she would like to sell it, that her price was $3,000, and she had her daughter take them through the house to examine it. Truesdale told her he did not think the property was worth more than $2,500. On that or a subsequent occasion she told Truesdale she had the property in the hands of Hammett, Anderson & Wade for sale and if she sold she would have to pay them a commission. She told Truesdale to tell Mr. McDonald, the salesman for Hammett, Anderson & Wade, and with whom she transacted other business, to come and see her. McDonald saw her and she said she would take $2,500 for the property, but she must have that clear of all commissions. McDonald and Truesdale then concluded the trade, the defendant agreeing to pay the commissions in addition to the $2,500. In making the transaction the plaintiff reserved the right to occupy a part of the house for a time. McDonald, Truesdale and the defendant all testify that they saw nothing during these negotiations to indicate that plaintiff was not of sound mind. They say she talked

rationally and knew what she was doing. This evidence stands uncontradicted.

Before the plaintiff concluded the sale, she sent for Mr. Harrigan whom she had known for many years and in whom she placed great confidence. He says he saw her at her house some two or three days before the sale, and to the best of his recollection she then spoke about selling the property. He was also present by appointment when the deed was executed. He called to see her a few days after the date of the deed. He says she then regretted having sold the property, said she did not feel like herself, and that spirits were bothering her. He then came to the conclusion she was not at herself.

The plaintiff remained at the asylum for a period of six or seven weeks, at the end of which time she had regained her mental health. She testified on the trial of this case, and there can be no doubt but she was perfectly sane at that time.

A grantor in a deed may avoid the conveyance by showing that he was *non compos mentis* at the time it was executed. But the mere fact that the mind of a person is impaired by age or disease does not render such person incompetent to make valid contracts. The legal test is the capacity to understand the nature and effect of the transaction. If a person understands the nature of the business in which he is engaged and the effect of what he is doing, his acts are valid, and this is true though the mind of such person may be impaired by age or disease. 1 Parsons on Contracts [7 Ed], 383.

Whatever the law may have been at one time, it is now quite well settled that a person may be insane upon one subject, and yet sane upon other subjects. To invalidate an instrument because of monomania or partial insanity, it must appear that the partial insanity

related to the subject of the contract in question. *Benoist v. Murrin*, 58 Mo. 307. Nor do delusions or hallucinations avoid capacity if not touching the subject-matter of the contract. The party seeking to avoid a contract by reason of a hallucination must show its existence at the time of making the contract, and that the hallucination was of a character affecting his capacity. It is now well settled that delusions and hallucinations must directly affect the act in question in order to incapacitate. 1 Wharton and Stille's Medical Jurisprudence, sec. 3. And even where there is an existing delusion as to the subject-matter of the contract, it has been held that the capacity to contract in respect of that subject-matter is still a question of fact. *Jenkins v. Morris*, L. R. 14, Ch. Div. 674.

If we lay aside the evidence of the daughter of the plaintiff and look alone to the evidence of the other witnesses produced by the plaintiff, we should have no hesitancy in coming to the conclusion that the plaintiff was afflicted with delusions at the time she executed the deed to such an extent as to show that her reason was completely dethroned. According to these witnesses she believed there were devils and spirits in her room, that they crawled over her and made her bed an abiding place. But the force of all this evidence so graphically narrated is much weakened by the evidence of the daughter. She says her mother did not speak of these things to strangers. The delusions related to her bodily and spiritual welfare, and had no direct relation to or connection with the subject matter of the contract in question. The other undisputed evidence in the case shows that she desired to sell the property, and that she talked about the sale as rationally as did the other persons engaged in the negotiation. She described the location of the sewer connections, and arranged for possession

of a part of one house for a time. That she was afflicted with delusions on some subjects may be conceded, but these hallucinations had nothing to do with the subject of this contract. The real question in this case is one of fact, and that is whether the plaintiff had sufficient reason to know and understand what she was doing in making the sale. The trial judge with all of the witnesses before him found that she had, and we can find nothing in this record to justify us in disturbing that finding.

The evidence shows clearly that the plaintiff regretted having sold the property, and the fact that she had sold it had much to do with her subsequent mental condition, but the validity of this deed must be determined by the condition of her mind when she executed it. That she executed it knowingly is well established by facts and circumstances which are not to be disregarded. The judgment is affirmed. All concur.